IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

THOMAS ROGER ROWE,   )
            )
   Plaintiff,    )
            )
  v.        )  Case No.
            )  15-4130-CV-C-REL-SSA
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
            )
   Defendant.   )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Thomas Rowe seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred by not contacting Rochelle Vale, D.O., for clarification of her opinion, and by finding that plaintiff is capable of performing light work. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

On June 11, 2012,[1] plaintiff applied for disability benefits alleging that he had been disabled since December 31, 2010. Plaintiff's disability stems from heart problems, limitation in his right arm due to a broken clavicle, and back problems. Plaintiff's application was denied on October 9, 2012. On December 3, 2013, a hearing was held before an Administrative Law

---

[1]This is plaintiff's fifth application for disability benefits (Tr. at 196). Plaintiff had previously filed an application for disability in March 2011. That application was denied in August 2011, and plaintiff did not appeal the denial. Plaintiff also filed applications for disability benefits in 2001, 2004 and 2006 (Tr. at 87, 95, 196). All were denied (Tr. at 196).

Judge.  On April 18, 2014, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On April 20, 2015, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative

2

decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.      BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV.   THE RECORD

The record consists of the testimony of plaintiff and vocational expert Denise Waddell, in addition to documentary evidence admitted at the hearing.

### A.   ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1972 through 2013, shown in both actual and indexed figures:

| Year | Actual Earnings | Indexed Earnings |
|---|---|---|
| 1972 | $ 525.30 | $ 3,043.72 |
| 1973 | 2,975.89 | 16,227.67 |
| 1974 | 6,334.97 | 32,606.60 |
| 1975 | 7,187.21 | 34,420.79 |
| 1976 | 11,050.90 | 49,508.44 |
| 1977 | 13,059.63 | 55,199.42 |
| 1978 | 13,671.26 | 53,533.49 |
| 1979 | 14,415.00 | 51,905.19 |
| 1980 | 13,249.15 | 43,765.13 |
| 1981 | 17,748.57 | 53,265.90 |

4

| | | |
|---|---:|---:|
| 1982 | 20,826.75 | 59,242.51 |
| 1983 | 18,739.91 | 50,830.20 |
| 1984 | 18,432.91 | 47,221.60 |
| 1985 | 23,932.43 | 58,804.92 |
| 1986 | 26,889.70 | 64,166.75 |
| 1987 | 30,016.60 | 67,334.25 |
| 1988 | 15,373.00 | 32,866.51 |
| 1989 | 21,158.62 | 43,512.96 |
| 1990 | 3,870.00 | 7,607.31 |
| 1991 | 11,635.73 | 22,050.77 |
| 1992 | 19,090.88 | 34,406.21 |
| 1993 | 12,903.49 | 23,056.80 |
| 1994 | 13,371.03 | 23,267.75 |
| 1995 | 16,350.30 | 27,355.64 |
| 1996 | 4,739.16 | 7,559.38 |
| 1997 | 0.00 | 0.00 |
| 1998 | 0.00 | 0.00 |
| 1999 | 0.00 | 0.00 |
| 2000 | 11,915.50 | 15,317.36 |
| 2001 | 10,772.50 | 13,525.36 |
| 2002 | 254.25 | 316.05 |
| 2003 | 0.00 | 0.00 |
| 2004 | 714.75 | 828.76 |
| 2005 | 4,678.04 | 5,232.78 |
| 2006 | 540.00 | 577.49 |
| 2007 | 10,354.72 | 10,592.92 |
| 2008 | 12,559.25 | 12,559.25 |
| 2009 | 13,301.10 | 13,301.10 |
| 2010 | 13,893.30 | 13,893.30 |
| 2011 | 7,101.50 | 7,101.50 |
| 2012 | 1,770.00 | 1,770.00 |
| 2013 | 0.00 | 0.00 |

(Tr. at 170-171, 173).

Case 2:15-cv-04130-REL   Document 28   Filed 06/27/16   Page 5 of 47

**Function Report**

In a Function Report dated July 20, 2012, plaintiff reported that he lives alone in a house (Tr. at 216-223). He described his day as relaxing, going for a walk, and eating. When asked what he was able to do before his impairment, he wrote, "get out in the heat, stand up for more than 2 hours, 'I'm unmotivated.'" He has no difficulty caring for his hair, feeding himself, or using the toilet. When he bends over while getting dressed, he loses his vision. He stopped taking showers because of the risk of falling. He prepares his own meals. He can cook pork steaks and chicken pot pies, and he can cut up fruit. His impairment has not affected his cooking habits. Plaintiff can do light cleaning, sweeping and vacuuming; he trims the bushes and mows the grass if it is not too hot. When he goes outside, he can walk and ride a bicycle. He shops for groceries in stores. Plaintiff goes fishing when it is nice outside. He is no longer able to hunt. His social activities include fishing, visiting people, riding his bike to his sister's or to church, and he does these things often.

Plaintiff has no problems getting along with others. His impairments affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, understand, and follow instructions. His impairment does not affect his ability to talk, hear, use his hands or get along with others. He is able to finish what he starts. Plaintiff is capable of driving (Tr. at 225).

**B.     SUMMARY OF MEDICAL RECORDS**

On March 19, 2011, plaintiff went to the emergency room complaining of significant chest tightness and nausea (Tr. at 253-291, 308-375, 390-399). He reported a history of hypertension which had gone untreated for the past several years. He denied muscle and joint

6

pain, stiffness, swelling and limitation of movement, but reported a history of shoulder surgery (Tr. at 310, 325-326). He denied nervousness, mood swings and depression (Tr. at 310). Plaintiff was on no medications for any condition at the time. His blood pressure was initially 200/128; about 5 1/2 hours later it was down to 136/84 (Tr. at 310, 325). In the emergency room he was diagnosed with a non-ST elevation myocardial infarction with a peak troponin of 7.22,[2] and he was admitted to the hospital (Tr. at 312). The following day plaintiff underwent a left heart catheterization,[3] selective coronary angiography,[4] and left ventriculography (checks the pumping function of the heart) at Lake Regional Health System, performed by Muthu

---



[2]A non-ST elevation myocardial infarction is a type of heart attack. Heart attacks are diagnosed mainly through two ways - a blood test that shows elevated levels of certain markers of heart damage such as cardiac troponin, and an EKG which can help identify the area of the heart that is affected. "Non-ST elevation" refers to the ST wave on an echocardiogram. If there is elevation of the blood markers suggesting heart damage (a normal troponin level is .01) but no ST elevation seen on the EKG tracing, a non-ST elevation myocardial infarction will likely be diagnosed. A cardiologist will likely prescribe blood-thinning agents and other medications. The patient may have an angiogram, which involves injecting dye into the heart arteries to look for blockages.

[3]Cardiac catheterization is a procedure used to diagnose and treat cardiovascular conditions. During cardiac catheterization, a long thin tube called a catheter is inserted in an artery or vein in your groin, neck or arm and threaded through your blood vessels to your heart. Using this catheter, doctors can then do diagnostic tests as part of a cardiac catheterization. Some heart disease treatments, such as coronary angioplasty, also are done using cardiac catheterization.

[4]A coronary angiogram is a procedure that uses x-ray imaging to see your heart's blood vessels. Coronary angiograms are part of a general group of procedures known as heart (cardiac) catheterization. During a coronary angiogram, a type of dye that is visible by an x-ray machine is injected into the blood vessels of your heart. The x-ray machine rapidly takes a series of images (angiograms), offering a detailed look at the inside of your blood vessels.

7

Krishnan, M.D. (Tr. at 248-250). Plaintiff's ejection fraction[5] was approximately 40% (described as mildly diminished). He had 70-80% blockage in multiple coronary vessels.

Plaintiff reported smoking a pack of cigarettes per day for the past 32 years. He was previously a heavy drinker for about ten years, drinking up to a 12 pack per day, but he reported that he quit in 2002. During a review of systems, plaintiff denied joint discomfort. A coronary bypass was scheduled for the following day.

On March 21, 2011, coronary bypass grafting was performed by Randall Juleff, M.D. Around noon on March 26, 2011, plaintiff was discharged from the hospital (Tr. at 292, 304, 390-391). He was told not to lift, push or pull more than 10 pounds for a month, no strenuous activity with his upper body for a month, walk every day, get up and stay out of bed all day every day, elevate his feet when he is not walking, and no driving for two weeks (Tr. at 304-307). At about 7:30 that evening, plaintiff went to the emergency room complaining of elevated blood pressure and blurry vision (Tr. at 379-383). He denied chest pain or difficulty breathing (Tr. at 294). After examination, blood work and tests, plaintiff was assessed with anxiety

---

[5]Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts. During each heartbeat pumping cycle, the heart contracts and relaxes. When your heart contracts, it ejects blood from the two pumping chambers (ventricles). When your heart relaxes, the ventricles refill with blood. No matter how forceful the contraction, it never is able to pump all of the blood out of a ventricle. The term "ejection fraction" refers to the percentage of blood that is pumped out of a filled ventricle with each heartbeat. The left ventricle is the heart's main pumping chamber that pumps oxygenated blood through the ascending (upward) aorta to the rest of the body, so ejection fraction is usually measured only in the left ventricle (LV). An LV ejection fraction of 55 percent or higher is considered normal. http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286

following bypass surgery (Tr. at 296, 383). He was given a prescription for Lorazepam[6] with no refills.

On March 31, 2011, plaintiff was seen by Charles Norris, M.D., at Lake Regional Health System for a follow up (Tr. at 252). His pulse was 107, blood pressure was 147/98. He had half his staples removed.

That same day he saw William McDonald, D.O., at Lake Regional Medical Group for urinary problems (Tr. at 426-428, 600-602). "Joints in whole body hurts [sic]." Plaintiff said he had pain in his thoracic spine "due to no discs in his back due to his old occupation." He said he recently had bypass surgery and was having "lots of pain. Norco 5[7] is not helping." Plaintiff denied dizziness; he continued to smoke. His blood pressure was 124/68. He was noted to be comfortable, cooperative and pleasant. His cardiovascular exam was normal. He had normal range of motion. His entire exam was normal. He was assessed with chronic pain syndrome. His dosage of Norco (narcotic) was doubled to 10-325 mg and he was told to take it every 6 hours, every day, with two refills.

On April 7, 2011, plaintiff was seen by Charles Norris, M.D., at Lake Regional Health System for a follow up (Tr. at 251). His pulse was 66, blood pressure was 154/97. "No problems."

On April 26, 2011, plaintiff saw William McDonald, D.O., of Lake Regional Medical Group for medication refills (Tr. at 424-425, 598-599). "No complaints other than his regular

---

[6]Also called Ativan, Lorazepam is a schedule IV controlled substance used to treat anxiety.

[7]Norco 5/325 is the brand name for hydrocodone/acetaminophen, with "5" referring to the dosage of hydrocodone and "325" referring to the dosage of acetaminophen. Norco is a schedule II controlled substance used to treat pain.

pain." Plaintiff denied dizziness; he continued to smoke. He was observed to be comfortable, cooperative and pleasant. His cardiac exam was normal. A musculoskeletal exam revealed normal range of motion. He was assessed with chronic pain syndrom. Plaintiff's Norco (narcotic) was refilled and he was told to take one every six hours, every day, with two refills.

On May 24, 2011, plaintiff saw William McDonald, D.O., of Lake Regional Medical Group for a follow up (Tr. at 422-423). "Hurt back, little better now. Shoulders hurting. . . . Back is bothering him due to moving sodas and containers at convenience store." Plaintiff denied dizziness. Plaintiff continued to smoke. His blood pressure was 148/90. Dr. McDonald observed that plaintiff was comfortable, cooperative and pleasant. His cardiac exam was normal. He had low back pain, chest wall pain and shoulder pain. Plaintiff was assessed with chronic pain syndrome. It was noted that his prescription for Norco did not need to be refilled until the end of June.

On June 13, 2011, plaintiff saw William McDonald, D.O., of Lake Regional Medical Group for a follow up (Tr. at 420-421, 594-595, 596-597). "Still having a lot of pain." Plaintiff denied dizziness; he continued to smoke. His blood pressure was 160/108. He had a urine test. On exam he was noted to be comfortable, cooperate, pleasant. His cardiac exam was normal. There is no indication that any exam was done of plaintiff's musculoskeletal system, his back, or his extremities. Plaintiff was told to follow up in three months.

On September 12, 2011, plaintiff saw William McDonald, D.O., of Lake Regional Medical Group (Tr. at 417-419, 591-593). He reported he had been taking 2 pain pills at night in order to sleep. He continued to smoke. He denied dizziness. Plaintiff's blood pressure was

158/90.  He was described as comfortable, cooperative, pleasant.  His physical exam was normal.  He was told to continue taking Norco (narcotic) every six hours every day.

On April 5, 2012, plaintiff aw William McDonald, D.O., of Lake Regional Medical Group  (Tr. at 415-416, 589-590).  Plaintiff complained of lower back pain which started 3 weeks ago and "hurts to walk."  He had been working in the weeds when his back pain started, and he reported having back trouble since he was a young adult (Tr. at 416).  He denied dizziness.  Plaintiff also complained of frequent urination.  He continued to smoke.  Plaintiff's blood pressure was 178/100.  He was observed to be "comfortable, cooperative, pleasant."  He had decreased range of motion of his dorsal spine.  His urine test was normal.  He was assessed with urinary frequency, chronic pain syndrome, and anxiety.  Dr. McDonald refilled plaintiff's Norco (narcotic) to be taken every six hours every day with two refills.  He gave plaintiff a steroid injection in his hip.

On April 16, 2012, plaintiff had x-rays of his lumbar spine due to complaints of low back pain (Tr. at 411).  The x-rays were normal with the exception of "mild degenerative changes."

On April 20, 2012, plaintiff saw William McDonald, D.O., at Lake Regional Medical Group, for a refill on pain medication and to discuss the results of his x-ray (Tr. at 587-588).  Plaintiff continued to smoke.  He reported continued urinary frequency.  He was referred to Eugene Dixon for urinary frequency.  The record states that plaintiff had been experiencing "grinding lower lumbar pain for 3 weeks after working in weeds."  X-rays showed mild degenerative joint disease.  For chronic pain syndrome, he was prescribed Naproxen (non-steroidal anti-inflammatory) and was told to stop taking Ibuprofen (non-steroidal anti-inflammatory).  His current medications included Norco, 10/325 mg every six hours.

On May 8, 2012, plaintiff went to the emergency room complaining of dizziness (Tr. at 403-410). His blood pressure was 154/96. He reported no pain (Tr. at 404). Plaintiff continued to smoke a pack of cigarettes per day and had for more than 30 years (Tr. at 408). He was assessed with hypertension and told to follow up with his family doctor.

On May 31, 2012, plaintiff had an MRI of his lumbar spine due to complaints of low back pain (Tr. at 401). Impression was listed as follows:

1.    Asymmetric disc bulge[8] at the L3-L4 level resulting in slight central canal and mild left neural foraminal stenosis[9]

2.    Slight disc bulge at L4-L5 resulting in slight bilateral neural foraminal stenosis

3.    Abnormal signal in the L4 vertebral body suggesting a slight subacute compression fracture. There is no retropulsion (pushing back) or narrowing of the central canal. "If the patient has no history of trauma, a bone scan might be considered to evaluate for a metastatic pattern if clinically warranted."

Plaintiff also had a CT scan of his pelvis (Tr. at 402). The radiologist suspected a healing compression fracture of L4, and less likely was the possibility of metastatic disease

---

[8]



Spinal discs are rubbery cushions between the individual bones (vertebrae) that stack up to make your spine. A bulging disc is one in which the tough outer layer of the disc bulges into the spinal canal. http://www.mayoclinic.org/diseases-conditions/herniated-disk/multimedia/bulging-and-herniated-disks/img-20007335

[9]Neural foraminal stenosis refers to compression of a spinal nerve as it leaves the spinal canal through the foramen (the opening between the vertebrae through which spinal nerve roots travel and exit to other parts of the body).

which could be ruled out with a bone scan.  The CT scan also showed a previous fracture of the left sacral area and moderate atherosclerotic[10] changes of the aorta and atrophy of one kidney.

On June 7, 2012, plaintiff had a whole body bone scan due to complaints of low back pain and probable compression fracture seen on recent MRI (Tr. at 400, 431).  "Please evaluate for metastatic disease."  John Dymond, M.D., found no obvious metastatic disease, but activity within the L4 vertebral body consistent with a recent fracture, and activity within the left 5th rib anteriorly and body of the sternum probably related to a recent trauma.

On June 19, 2012, plaintiff saw Eugene Dixon, M.D., for complaints of urinary frequency (Str. at 412-414).  Plaintiff reported his current medications as Metoprolol,[11] Amlodipine Besylate as needed (also called Norvasc, treats hypertension), Nitrostat (also called Nitroglycerin, treats and prevents chest pain) as needed, Flexeril (muscle relaxer) as needed, Atorvastatin (for high cholesterol), Lisinopril (for hypertension), Naproxen (non-steroidal anti-inflammatory) as needed, Norco (narcotic) every six hours, aspirin, Lorazepam (for anxiety), and pacerone (anti-arrhythmic).  Plaintiff reported having urinary frequency for several years, it had not worsened, and it was not a problem at night as he was only getting up once a night to use the bathroom.  Plaintiff was asked numerous questions about his symptoms including the

---

[10]Arteriosclerosis occurs when the blood vessels that carry oxygen and nutrients from your heart to the rest of your body (arteries) become thick and stiff - sometimes restricting blood flow to your organs and tissues.  Healthy arteries are flexible and elastic, but over time, the walls in your arteries can harden, a condition commonly called hardening of the arteries.  Atherosclerosis is a specific type of arteriosclerosis, but the terms are sometimes used interchangeably.  Atherosclerosis refers to the buildup of fats, cholesterol and other substances in and on your artery walls (plaques), which can restrict blood flow.

[11]Metoprolol, also called Toprol, is a beta blocker that affects the heart and circulation.  It is used to treat chest pain and high blood pressure, and to treat or prevent heart attack.

Case 2:15-cv-04130-REL   Document 28   Filed 06/27/16   Page 13 of 47

following "quality of life question" – "if you were to spend the rest of your life with your urinary condition just the way it is now, how would you feel about that?" He answered, "delighted." Plaintiff's blood pressure was 110/68. He was asked about neurologic symptoms, and he said he "blacked out a few times when I was in jail." Plaintiff was given a prescription for Ditropan (treats overactive bladder).

On August 24, 2012, plaintiff saw Mary Bohon, a nurse practitioner with Lake Regional Medical Group (Tr. at 584–585). Plaintiff complained of right shoulder pain, "unable to pick up coffee due to his right shoulder pain and weakness for 2 months now." Plaintiff said the Hydrocodone (referring to Norco) was not helping. On exam he had painful range of motion in his right shoulder as well as decreased strength. X-rays showed mild arthritic changes and old clavicle and rib fractures. He had normal range of motion in all joints. He continued to smoke but said he was thinking about quitting. Ms. Bohon assessed shoulder pain and nondependent tobacco use disorder. He was given a referral to an orthopedist for a steroid injection and was urged to quit smoking.

On September 7, 2012, Pauline Abbott, D.O., performed a disability evaluation (Tr. at 436–440). She reviewed plaintiff's x-rays, MRI, CT scan and bone scan.

> He states that he was in an accident in 1975 and twisted his back muscles, hurting his back and has had back problems since then. He states that for the first year after this accident he treated with a chiropractor and did get better. However with time, he states that his low back pain has become constant. Presently aggravating factors include bending and heavy lifting. It is better with his medication of vicodin [narcotic] and flexeril [muscle relaxer].

> \* \* \* \* \*

> He states that he has had right shoulder pain for the past 2 years and in the past 2 months it has become unbearable. He states that the pain is in the lateral side of his shoulder and upper arm. Most of the pain is when he elevates his arm.

14

He states that he also has a constant ache in his hips and knees. He states with prolong[ed] activity/walking the ache intensifies but it is better with moist heat and rest.

. . . [He is not] able to taste his food anymore [and] he has lost 48 pounds in the past 2 months. He states that he hasn't had this worked up yet.

* * * * *

Work History: . . . He states that he worked as a meat cutter until March/April of 2012, at which time he was laid off. He states that he signed up for unemployment and has not worked since then.

Activities of Daily Living: He states that he does all his own personal activities of daily living without assistance or assistive devices.

* * * * *

Social History: He is divorced and lives by himself. He states that he has smoked 1 ppd for 37 years. He quit drinking in 2002 and then started drinking 2-3 beers/day last December. . . . He states that he does all his own cooking, cleaning, laundry and care of the house. . . . [H]e enjoys watching TV, fishing. . . . He states that after he gets up in the morning he will ride around on his lawn mower and visit people. He then will go home about 1 pm and rest for 1-3 hours. He does no[t] drive but his sister or friends will take him shopping or to his appointments. He states that he was in jail for several years for DUI.

Plaintiff reported fatigue, vision loss/blurred vision, neck pain, right shoulder pain, mid back pain, low back pain, bilateral hip pain, and bilateral knee pain. He denied anxiety. He weighed 151 pounds. His blood pressure was 168/100. He was noted to be very pleasant, talkative and cooperative. He had no problems breathing. His cardiac exam was normal. His gait was normal. He was able to get on and off the exam table and in and out of a chair without assistance. He could maneuver himself in the room without problems in walking or balance. He had normal strength in his arms and legs. He was able to squat without problems. Straight leg testing was negative. He had no muscle atrophy in his arms or legs.

15

Plaintiff had no tenderness or instability in his cervical spine. He had muscle tenderness but no spasm in his thoracic spine. His posture was slumped forward. He had tenderness and muscle tightness in his lumbar spine without instability. He had tenderness in his entire right shoulder joint but none in the left. He had no atrophy in his upper arm or forearm muscles. He had full strength in muscle testing of upper and lower arm muscles bilaterally. There was no swelling of elbow joints but there was tenderness in elbows and wrists. He had good grip strength and was able to do fine finger activity without problems. He had generalized tenderness at the hips and knee joints with normal strength.

Plaintiff's shoulder flexion (raising arm straight out in front of the body) on the right was 90° (normal is 150°), shoulder abduction (raising arm to the side of the body) on the right was 90° (normal is 150°), and external shoulder rotation on the right was 70° (normal is 90°). Right wrist dorsiflexion was 50° (normal is 60°) and right palmar flexion was 50° (normal is 60°).



Lateral flexion of the cervical spine (bending head side to side) was 25° on the right and 30° on the left (normal is 45°), cervical spine flexion (bending head forward) was 45° (normal is 50°), and cervical spine rotation (turning head side to side) was 60° on the left (normal is 80°). Flexion-extension of the lumbar spine (bending forward at the waist) was 70° (normal is 90°). All other range of motion measurements for plaintiff's shoulders, elbows, wrists, knees, hips, ankles, cervical spine, and lumbar spine were essentially normal. He was able to fully extend his hands, make a fist, and oppose his fingers. His grip strength in both hands was normal. Upper extremity strength was normal. Lower extremity

16

strength was normal. Straight leg raising was negative bilaterally in both the supine and seated positions.

Dr. Abbott assessed coronary artery disease, treated with medication; chronic back pain; right shoulder pain after three surgeries; arthritis of hip and knees; and recent and unconfirmed-unexplained weight loss.

> It is my medical opinion that he is able to sit or stand as needed, no prolong[ed] walking. He can lift and carry up to 25-30 pounds easily. He does not have any limitations in using his hands or handling objects. He is not limited in speaking or hearing or appropriately carrying on a conversation. He is limited in his travel and dependent on other people for transportation.

On September 21, 2012, plaintiff saw Mary Bohon, a nurse practitioner with Lake Regional Medical Group for medication refills: "will need hydrocodone and ativan by Oct. 13th" (Tr. at 581-582). Plaintiff requested a referral to an ENT regarding loss of taste and difficulty swallowing. On exam plaintiff was observed to have a normal gait. His physical exam was normal except painful and decreased range of motion in right shoulder compared to the left, and some slightly diminished breath sounds in lower lobes of his lungs. Plaintiff's Flexeril (muscle relaxer) was refilled, and he was referred to an ENT (there are no ENT records in this file). He was urged to stop smoking.

On December 11, 2012, plaintiff was admitted to the hospital after experiencing nausea and vomiting three weeks after a laparotomy[12] (Tr. at 619). He was given IV fluids and his

---

[12]Surgical procedure involving an incision through the abdominal wall to gain access into the abdominal cavity; an exploratory procedure. There are no medical records of this procedure in the file.

symptoms resolved. "CT scan showing possible adynamic ileus[13] with no evidence of bowel obstruction, ileus resolving clinically." Plaintiff continued to take Norco (narcotic), 10-325 mg, one to two tablets every four to six hours for pain. This record ends in the middle of a sentence.

On December 18, 2012, plaintiff saw Robert Mason, D.O., at Lake Regional Medical Group, which is Dr. McDonald's office (Tr. at 579-580). "Patient had 8 inches of his colon taken out about a month ago.[14] Then about a week ago his body shut down and he was back in the hospital for another week." Plaintiff was noted to be alert, talkative, pleasant. Plaintiff reported being a current smoker and when asked if he was interested in quitting, he said he was thinking about it. Dr. Mason's primary diagnosis was tobacco abuse disorder. He also assessed coronary atherosclerosis (see footnote 10 on page 13) of native coronary artery, anxiety, neck pain, and dental caries. Plaintiff was urged to quit smoking.

On February 7, 2013, plaintiff had a spirometry[15] due to complaints of shortness of breath when climbing hills and stairs (Tr. at 472-477). According to the doctor, given his 38-year history of smoking a pack of cigarettes per day, the results were "as expected."

_____

[13]Adynamic ileus is the failure of passage of intestinal contents through the small bowel and colon that is not mechanically obstructed. Essentially it represents the paralysis of intestinal motility, or the inability of the intestines to move its contents.

[14]There are no records of this surgery.

[15]"Spirometry is a common office test used to assess how well your lungs work by measuring how much air you inhale, how much you exhale and how quickly you exhale. Spirometry is used to diagnose asthma, chronic obstructive pulmonary disease and other conditions that affect breathing. Spirometry may also be used periodically to check whether a treatment for a chronic lung condition is helping you breathe better." http://www.mayoclinic.org/tests-procedures/spirometry/basics/definition/prc-20012673

18

On February 15, 2013, plaintiff saw Rochelle Vale, D.O., at Lake Regional Medical Group (the office of Dr. McDonald and Dr. Mason) to establish care (Tr. at 575-577). "He reports that his back pain is normally around an 8 or 9, the spinal specialist told him he is not a candidate for surgery." Plaintiff reported "general great limitation in motion, muscle and joint pain with stiffness." Plaintiff reported being a current smoker and said he was ready to quit. His medication list included Norco 10/325 mg. Plaintiff denied anxiety. On exam, Dr. Vale noted the following: "Extremities – no cyanosis, no edema, normal range of motion. Musculoskeletal – pt with slow antalgic gait, limited range of motion in lumbar region in all planes of motion, TTP [tender to palpation] in lumbar spine with paraspinal muscle spasms noted." Although plaintiff denied anxiety and Dr. Vale, on exam, noted appropriate mood and affect, her primary diagnosis was anxiety. She refilled plaintiff's Lorazepam. She also refilled plaintiff's Norco, 10/325 mg twice a day with two refills.

On May 23, 2013, plaintiff saw Rochelle Vale, D.O., for a follow up on chronic pain (Tr. at 569-570). "He reports that overall he is doing pretty well. . . . He reports that Dr. McDonald used to give him 120 Hydrocodone and the 60 that we are giving him is not enough to control his pain." Plaintiff's physical exam was normal except for an ulcer on his big toe and he was described as having a "slow antalgic gait" with limited range of motion in his lumbar spine with muscle spasms. Plaintiff continued to smoke but said he was "ready to quit." He was assessed with chronic anxiety, currently stable; hypertension, currently stable; and chronic pain, currently stable. "Pt reports that he has not been taking his meds as prescribed." Dr. Vale refilled plaintiff's Norco and gave him 100 pills per month instead of 60, as requested by plaintiff, with two refills.

19

On June 3, 2013, plaintiff saw Mary Bohon, a nurse practitioner in Lake Regional Medical Group (Tr. at 567-568). "Patient is here to check his blood pressure machine for accuracy." Plaintiff reported elevated blood pressure and passing out at his sister's home over the weekend. "Patient reports 2 other episodes where he has passed out, but does report that he had been drinking 'just a couple of beers, I wasn't drunk.'" Plaintiff's blood pressure was 184/110. Plaintiff's physical exam was normal. Plaintiff was given clonidine (lowers blood pressure), and was told to take extra amlodipine (calcium channel blocker used to treat high blood pressure and chest pain) that day. Plaintiff was referred to Muthu Krishnan, M.D., his cardiologist. Plaintiff was urged to stop smoking.

On June 4, 2013, plaintiff had a tilt table test[16] due to complaints of fainting (Tr. at 471). The test was normal.

On June 12, 2013, plaintiff had a CT scan of his pelvis due to "acute onset of low back pain." (Tr. at 470). There were no changes noted since his last scan.

On June 24, 2013, plaintiff saw Mary Bohon, a nurse practitioner in Lake Regional Medical Group (Tr. at 564-566). He complained of low blood pressure, ringing in his ears, and shooting pain on the left side of his head. Plaintiff's blood pressure was 108/66. Plaintiff's

---

[16]"A tilt table test is used to evaluate the cause of unexplained fainting (syncope). Your doctor may recommend a tilt table test if you've had repeated, unexplained episodes of fainting. A tilt table test may also be appropriate to investigate the cause of fainting if you've fainted only once, but another episode would put you at high risk of injury due to your work environment, medical history, age or other factors. For a tilt table test, you begin by lying flat on a table. Straps are put around your body to hold you in place. After about 15 minutes of lying flat, the table is quickly tilted to raise your body to a head-up position - simulating a change in position from lying down to standing up. The table will then remain upright for up to 45 minutes, while your heart rate and blood pressure are monitored. This allows doctors to evaluate your body's cardiovascular response to the change in position."
http://www.mayoclinic.org/tests-procedures/tilt-table-test/basics/definition/prc-20019879

physical exam was normal and his gait was observed to be steady. He had normal range of motion, normal stability, normal strength and normal muscle tone. He had no trouble breathing, no shortness of breath. He had no fatigue, no weakness. His same medications were continued. "Referral made to Medicaid services for In Home Assistance for med set-up. Patient has been advised to stop drinking and smoking as both can be causing his changes in BP and dizziness."

On June 28, 2013, plaintiff went to the emergency room complaining of feeling dizzy and experiencing blurred vision over the past week (Tr. at 458-469). His blood pressure was 122/76 on arrival at the ER. He was wearing a 30-day cardiac monitor per Dr. Krishnan's order (those medical records are not a part of this file). Plaintiff said he had been experiencing episodes of fainting for several months with the most recent having been the week before when he was walking to the mailbox. Plaintiff's current medications included Norco 10/325 (narcotic), Lorazepam (anti-anxiety), Flexeril (muscle relaxer), and Meloxicam (non-steroidal anti-inflammatory). Plaintiff reported that he cannot taste anything. He continued to smoke a pack of cigarettes per day and use alcohol. On exam he had full range of motion in his neck. His cardiovascular exam was normal, respiratory exam was normal, he had no tenderness in his back or extremities. He had an EKG, a CT scan of his head, extensive blood work, and x-rays of his chest, hands and elbows, all of which were normal. "Patient remained stable and in no distress and smiling and joking on reexamination." Plaintiff requested that he be able to go home. He was told to call his primary care doctor and to follow up with cardiology within the next week.

On July 2, 2013, plaintiff saw Rochelle Vale, D.O., for an ER follow up (Tr. at 561-563). "He was having fainting spells so we told him to go to ER. They have a heart monitor on him right now. . . . He was seen on 6/28 after several episodes of 'falling out' with loss of consciousness for undetermined amount of time, one episode was 15 min, the other two he is uncertain. Pt reports drinking with all occasions but that is not different from his baseline. He was seen in the ER and found to be hyponatremic [low blood sodium] at 124. He was given [IV fluids] and released. He reports that he felt like a million bucks after that. He states today he feels fine. We discussed that his drinking is affecting his health and the most likely cause of the hyponatremia." Plaintiff's physical exam was entirely normal. Dr. Vale assessed hyponatremia, chronic narcotic drug use, anemia, and syncope/collapse. Plaintiff was told to start taking prenatal vitamins and he was encouraged to stop drinking. Plaintiff continued to smoke.

On July 9, 2013, plaintiff saw Rochelle Vale, D.O., for a follow up on lab work (Tr. at 559-560). "Discussed that his anemia is not iron deficiency. We discussed that it is most likely his bone marrow not producing the cells like they should due to his alcohol intake. . . . He states that he feels great and has no complaints and really doesn't want to do any more tests to find out why his sodium was low causing him to pass out." (His sodium was 132, normal is 134-144). "Pt encouraged to decrease alcohol intake and drink water." Plaintiff continued to smoke. He said he was thinking about quitting.

On August 8, 2013, plaintiff saw Rochelle Vale, D.O., for a follow up on anemia (Tr. at 554-557). Plaintiff reported soreness in his elbow. His physical exam was normal except for

fluid collection on his elbow. Dr. Vale refilled plaintiff's Norco, Flexeril and Lorazapem. She drained plaintiff's elbow abscess.

On August 14, 2013, plaintiff had a second tilt table test due to complaints of fainting (Tr. at 457). The results were normal; he showed no symptoms during the test.

On August 21, 2013, plaintiff saw Rochelle Vale, D.O., for a follow up on his elbow (Tr. at 552-553). Plaintiff's physical exam was normal except his elbow. He was assessed with skin infection and abscess of the elbow. Dr. Vale gave plaintiff an antibiotic injection and prescribed an oral antibiotic.

On August 23, 2013, plaintiff saw Rochelle Vale, D.O., for a follow up on his elbow (Tr. at 550-551). "Pt denies following aftercare instructions and did not keep it clean." Plaintiff's physical exam was normal except his elbow, but there was no decreased range of motion in his elbow. Dr. Vale gave plaintiff an antibiotic injection.

On August 26, 2013, plaintiff saw Rochelle Vale, D.O. (Tr. at 548-549). "Reports getting pretty sick this weekend after being out in the sun despite being told that he shouldn't when he is on the Bactim." Plaintiff's physical exam was normal except his elbow, although he had no decreased range of motion in his elbow. He was told to continue taking the antibiotic.

On August 28, 2013, plaintiff saw Mary Bohon, a nurse practitioner in Lake Regional Medical Group, for a follow up on his left elbow (Tr. at 546-547). His physical exam was normal except his elbow. Ms. Bohon recommended an MRI of plaintiff's elbow; his insurance denied coverage for that test. Therefore, Ms. Bohon told plaintiff to limit using his elbow and avoid contact with hard surfaces. She referred him to Dr. Walker, an orthopedic surgeon. "Counseled patient on the dangers of tobacco use and urged to quit."

On September 5, 2013, plaintiff saw Rochelle Vale, D.O., for a follow up (Tr. at 544–545). "Pt reports that his pain is well controlled on his current regimen. . . . He reports having issues with blacking out at church on Sunday, states his blood pressure was very low, he has an appointment with Dr. Krishnan today." Plaintiff's physical exam was normal except plaintiff's elbow from his recent surgery. "I am concerned about joint infection due to acute onset of joint pain, patient was sent to the emergency room for evaluation." Dr. Vale refilled plaintiff's Norco. That same day, plaintiff went to the emergency room complaining of a swollen, red painful elbow and lightheadedness (Tr. at 448–456). Plaintiff's current medications included Norco (narcotic) every six hours, Meloxican (non-steroidal anti-inflammatory) and Flexeril (muscle relaxer). Plaintiff said he had had his left elbow drained almost two months ago, but the elbow was now painful with clear drainage. Plaintiff said he passed out three or four days ago when he was going from a sitting to standing position, but he denied dizziness, chest pain or shortness of breath. Plaintiff said he was unable to taste anything. He said he had had five heart attacks in the past. Plaintiff continued to smoke a pack of cigarettes per day. On exam plaintiff had full range of motion in his neck. His cardiovascular and respiratory exam was normal. "Orthostatics[17] negative, labs reassuring." Plaintiff was told to follow up with his orthopedic doctor. He was given another prescription for Norco (narcotic).

_____

[17]"Orthostatic hypotension -- also called postural hypotension -- is a form of low blood pressure that happens when you stand up from sitting or lying down. Orthostatic hypotension can make you feel dizzy or lightheaded, and maybe even faint. Orthostatic hypotension is often mild, lasting a few seconds to a few minutes after standing." http://www.mayoclinic.org/diseases-conditions/orthostatic-hypotension/basics/definition/con-20031255

Case 2:15-cv-04130-REL   Document 28   Filed 06/27/16   Page 24 of 47

On September 20, 2013, plaintiff saw Rochelle Vale, D.O., for an ER follow up (Tr. at 542-543). Plaintiff said Dr. Khan[18] had taken him off his blood pressure medication due to low blood pressure and syncope "while doing his tilt table test".[19] "Today he is elevated." Plaintiff said he was feeling well, and he had not had any other episodes of passing out. His physical exam was normal except for the wound from his recent elbow surgery. Plaintiff was told to call Dr. Krishnan's office regarding his blood pressure. There are no records suggesting that he ever called Dr. Krishnan about his blood pressure.

On September 23, 2013, plaintiff saw Alan Mead, M.D., for an epidural steroid injection in his lumbar spine (Tr. at 447).

On September 26, 2013, plaintiff saw Rochelle Vale, D.O., for a medication update and blood pressure check (Tr. at 540). Plaintiff's blood pressure was 178/100. He was told to stop taking his daily aspirin, and she prescribed Lisinopril.

On October 7, 2013, plaintiff saw Alan Mead, M.D., for an epidural steroid injection in his lumbar spine (Tr. at 446).

On October 18, 2013, plaintiff saw Rochelle Vale, D.O., for a follow up on hypertension and syncope (Tr. at 537-539). Plaintiff reported only having one episode of pre-syncope, it occurred the night before, and it happened when he tried to stand up too fast. "He does not think it has anything to do with the 8 cans of beer that he had. He also reports that he is having issues with memory and we discussed that it is most likely due to his chronic alcohol

---

[18]There are no records from Dr. Khan anywhere in this file.

[19]Plaintiff had two previous tilt table tests and showed no symptoms during either. I have found no record of plaintiff having been taken off his hypertension medication due to low blood pressure or due to symptoms during a tilt table test.

25

use." Plaintiff's physical exam was normal except he had decreased range of motion in his lumbar spine. He was assessed with hypertension, other osteoporosis, coronary atherosclerosis of artery bypass graft, chronic pain, anxiety, and tobacco use disorder. She refilled his Norco (narcotic).

On October 21, 2013, plaintiff saw Alan Mead, M.D., for an epidural steroid injection in his lumbar spine (Tr. at 445).

On October 29, 2013, plaintiff had a spiral CT scan of his abdomen and pelvis due to blood in his stool (Tr. at 444). No abnormalities were found other than renal atrophy unchanged and mild to moderate atherosclerotic changes of the aorta, unchanged.

On November 11, 2013, plaintiff had a follow up on his left elbow with Ricky Walker, D.O., an orthopedic doctor (Tr. at 481-482). "He states that he is doing well today." His current medications included Norco (narcotic) every six hours, Flexeril (muscle relaxer), and Meloxicam (non-steroidal anti-inflammatory). He continued to smoke. Plaintiff was assessed with cellulitis (skin infection) and abscess of the elbow.

On November 12, 2013, plaintiff saw Mary Bonhon, a nurse practitioner in Lake Regional Medical Group, complaining of burning while urinating for the past two weeks (Tr. at 529-531). Plaintiff had not taken his blood pressure medication that day (Tr. at 530). Blood work was normal, a urinalysis was normal. Plaintiff was told to stop smoking.

On November 18, 2013, plaintiff had chest x-rays which were unchanged since his last scans on June 28, 2013 (Tr. at 495). He also had an EKG and lab work (Tr. at 496-500).

On November 19, 2013, plaintiff saw Thomas Reinsel, M.D., at the Missouri Spine Center complaining of lower back pain, left groin and thigh pain, and mid scapular pain (Tr. at

515-517).  Plaintiff described his pain as a 10/10 currently, despite continuing to take Norco (narcotic), Flexeril (muscle relaxer), and Naproxen (non-steroidal anti-inflammatory), and Dr. Reinsel described him as a pleasant gentleman in no acute distress.  Plaintiff said his pain was worse with walking or standing and would get better when sitting; bending forward exacerbates his lower back pain, walking aggravates his mid scapular pain.  Plaintiff's gait was normal.  He had some tenderness on palpation in his lumbar spine.  Extension was "fairly good" and he was able to reach his mid-distal calf with his fingertips.  His physical exam was normal. Dr. Reinsel reviewed lumbar spine x-rays from January 15, 2013.  "Compression fractures of L3 and L4 are seen.  MRI of his lumbar spine from the same date was reviewed as well.  He has fairly severe central stenosis at L2-3 and mild stenosis with some left-sided foraminal narrowing at L3-4." (see footnote 9, page 12)  New lumbar spine x-rays were taken on this day which showed some scoliosis (abnormal curvature of the spine) but no new deformity.  Disc heights were all relatively well maintained.  Pelvis x-ray looked normal and showed no significant arthritis in his hips.  Dr. Reinsel recommended that plaintiff follow through with his left elbow surgery and colonoscopy and once he had recovered from those problems he could address his back and possibly try gabapentin (treats nerve pain).

On November 22, 2013, plaintiff had a colonoscopy and an upper GI endoscopy[20] (Tr. at 490-494).  The results were normal.  "He is to stay on a high fiber diet, avoid constipation."

---

[20]An upper GI endoscopy or EGD (esophagogastroduodenoscopy) is a procedure to diagnose and treat problems in your upper GI tract (gastrointestinal tract).  The upper GI tract includes your food pipe (esophagus), stomach, and the first part of your small intestine (the duodenum).

On November 25, 2013, plaintiff had a bursectomy[21] of the left elbow performed by Rickey Walker, D.O. (Tr. at 485-486).

On November 26, 2013, plaintiff saw Mary Bohon, a nurse practitioner in Lake Regional Medical Group (Tr. at 526-527). He complained of numbness in his left arm and hand, and said he had had elbow surgery the day before. Ms. Bohon observed that plaintiff's hands were cold to the touch. She assessed poor circulation of both hands and tobacco use disorder. "Advised patient to reduce smoking as his circulation is being affected by it. . . . Patient counseled on the dangers of tobacco use and urged to quit. Setting a target date for cessation."

On December 20, 2013, Rochelle Vale, D.O., wrote a letter to whom it may concern (Tr. at 507, 604). "Thomas is a patient in the Laurie Clinic. He is seen here on a very regular basis. Thomas has several diagnosis [sic] of which the main ones are chronic back pain, lumbar spinal stenosis, compression fracture of lumbar spine, scoliosis, degenerative disease of lumbar spine, and anxiety. Tom would not be able to seek gainful employment due to the back pain and disability. He would have issues sitting or standing for any length of time. He has pain and weakness of his lower extremities due to the severe back degeneration. He is not able to seek employment most likely for the extent of his life."

On January 2, 2014, plaintiff saw Thomas Reinsel, M.D., at the Missouri Spine Center complaining of left groin and thigh pain and lower back pain (Tr. at 512-514). Plaintiff's symptoms were the same as they were at his previous visit a couple months ago. "He still has

---

[21]A bursectomy is the removal of a bursa, which is a small sac filled with synovial fluid that cushions adjacent bone structures and reduces friction in joint movement. A bursectomy is usually carried out to relieve chronic inflammation (bursitis) or infection.

the lower back pain which is fairly diffuse in his lumbar spine and is characterized as more of a dull ache. He has a fairly sharp intermittent pain which starts in his left groin and travels down the anterior aspect of his thigh." This normally bothers plaintiff when he first starts to walk, but once he is able to start walking around the pain improves. "He sometimes has pain in his left groin and thigh when sitting, although usually sitting is not as bad." He described his pain as a 9/10 in severity, despite continuing to take Norco (narcotic) and Flexeril (muscle relaxer), and Dr. Reinsel described plaintiff as a pleasant gentleman in no acute distress. Plaintiff stated that he "occasionally takes lorazepam 1 mg at night when he has difficulty sleeping." Plaintiff's gait was slightly antalgic, favoring his left hip. He was able to walk on his heels and toes without difficulty. His physical exam was normal. Dr. Reinsel reviewed lumbar spine x-rays from January 15, 2013. "He does have compression deformities of L4 and L3 with decreased lumbar lordosis (curvature of the lower spine). Disc heights appear to be well-maintained. He does have some scoliosis on his AP view. MRI of his lumbar spine from the same date shows foraminal stenosis present at L2-3 on the left with some mild to moderate central stenosis and similar findings at L3-4 (see footnote 9, page 12). He does have some decreased signal and disc bulging at L2-3 and L3-4. Pelvis x-ray from a couple of months ago really doesn't look that bad. His hips look fairly symmetric." Dr. Reinsel recommended plaintiff try gabapentin. He indicated that he would "need to investigate his left hip with additional studies such as an MRI prior to considering any lumbar surgery."

On January 23, 2014, plaintiff saw Rochelle Vale, D.O., for a follow up on chronic pain (Tr. at 523-525). "His blood pressure continues to be an issue however he has already smoked

Case 2:15-cv-04130-REL   Document 28   Filed 06/27/16   Page 29 of 47

a half a pack of cigarettes[22] and had 6 cups of coffee." Plaintiff's anxiety was described as controlled, and he said he was tolerating all of his medications without intolerable side effects. Plaintiff's physical exam was normal. Dr. Vale assessed degenerative disc disease, other osteoporosis, glycosuria (excess sugar in the urine), anxiety, chest pain, tobacco use disorder and dental abscess. She refilled his Gabapentin, Meloxicam, Flexeril, Norco, and Lorazepam. "Patient counseled on the dangers of tobacco use and urged to quit."

On February 18, 2014, plaintiff saw Tom Reinsel, M.D., at the Missouri Spine Center, complaining of left groin and left anterior thigh pain and difficulty lifting his left leg (Tr. at 509-511). His symptoms had not changed at all since his first visit in early January. Walking short distances helped with the pain, but walking more than 5 or 10 minutes aggravated the pain. Sitting more than 15 to 30 minutes also aggravated his pain. Plaintiff had been using gabapentin. He described his pain as a 9/10 in severity, yet Dr. Reinsel described plaintiff as a pleasant gentleman in no acute distress. He observed that plaintiff's gait was normal. He was able to walk on heels and toes without difficulty. Flexion was "fairly good" and plaintiff could reach his mid calf with his fingertips. He had some tenderness in his lumbar spine but no muscle spasm. Plaintiff's physical exam was normal. "Radiographic review: My previous notes were reviewed. Phone reports from Rachel were reviewed which indicate some confusion. My previous reports indicated compression deformities of L3 and L4 with scoliosis and foraminal stenosis on his MRI L2-3 left with moderate central stenosis L3-4 [see footnote

_____

[22]Interestingly, in the social history section of this medical record, it states that plaintiff had not smoked in two days but he was not ready to quit although he was cutting down. This directly contradicts what he told Dr. Vale about having already smoked a half a pack of cigarettes that day before going to her office (Tr. at 524).

9, page 12]. Pelvis x-ray didn't really show much hip pathology." Dr. Reinsel assessed "some lower back and left hip and thigh symptoms that possibly is related to his spinal stenosis, but also possibly related to some hip pathology. Mr. Rowe has always been difficult to get an accurate history from and his intention for today's visit apparently was to investigate whether there was any surgery that could help him. I am not certain that surgery on his spine would be such good choice for him and he understands that often times spine surgery is not successful at relieving chronic symptoms. His pain doesn't really fit easily with any spine condition and he could possibly have left hip component to his pain." Dr. Reinsel recommended a CT myelogram of the lumbar spine and a referral to Dr. Ajay Aggarwal to evaluate possible left hip pathology. "I would not be willing to consider surgery on him if he were smoking and we should probably hold off on any referrals or tests if he continues to smoke."

On March 17, 2014, plaintiff saw Rochelle Vale, D.O. complaining of shortness of breath for the past week (Tr. at 520-522). Plaintiff's current medications included Norco, Naproxen, Gabapentin, and Flexeril. Plaintiff stated that the other day he cold not get a full sentence out due to shortness of breath. His physical exam was normal, including his cardiac and respiratory exam. Plaintiff's oxygen saturation level was normal while sitting and walking, even though plaintiff complained of shortness of air while walking. Dr. Vale assessed dyspnea (shortness of breath), bronchospasm, and tobacco use disorder. She prescribed Combivent inhaler and told plaintiff to stop smoking. Plaintiff was asked if he was interested in quitting smoking, and he said he was "not ready to quit." (Tr. at 522).

31

## C.  SUMMARY OF TESTIMONY

During the December 3, 2013, hearing, plaintiff testified; and Denise Waddell a

vocational expert, testified at the request of the ALJ.

### 1.  Plaintiff's testimony.

At the time of the hearing, plaintiff was living in his son's house with a roommate who

has a handicap but watches over plaintiff in case he has heart seizures or a heart attack (Tr. at

48, 49).  The two help each other out (Tr. at 48).  Plaintiff does not know his roommate's last

name (Tr. at 49).  Plaintiff does not have a driver's license because he blacks out due to low

blood pressure that suddenly gets very high (Tr. at 50).  He has not driven since about 2011

(Tr. at 50).  Plaintiff gets rides from his sister or his son, LogistiCare picks him up and takes

him to the hospital or to doctors' offices, and his has an in-home healthcare person who takes

him shopping (Tr. at 51).  He got the in-home healthcare assistant in approximately September

2013 (Tr. at 51).  A housekeeper from Heritage Homecare also comes once a week to clean for

him (Tr. at 51).  Dr. Vale, plaintiff's primary care physician, did not want plaintiff lifting or

doing anything around the house (Tr. at 51).

Plaintiff went to school through 10th grade (Tr. at 52).  He went into the masonry

business in 1974 or 1975 (Tr. at 55).  In 1975 he had an accident and although it took ten years

for that to catch up to him, he now has health problems because of it (Tr. at 55).  Plaintiff's head

turned to the right and was "literally" looking backwards, and his doctor wanted to put him in a

straight body cast (Tr. at 55).  Then a chiropractor, Dr. Anderson, said it would take a year to

fix, but he could correct plaintiff's spine (Tr. at 55-56).  Plaintiff left the masonry business in

1996 when he went into business for himself, the same time he got divorced (Tr. at 56).  He

ended up in Oklahoma in 2004 where he was helping to build a new county jail, but he had another heart attack and ended up in Dallas at the University of Texas (Tr. at 56, 57). He stayed in Texas for six or seven years (Tr. at 56). Then his parents asked him to come help them out with their grocery store because it was too much for his sister to be doing (Tr. at 56). Plaintiff's parents have since sold the grocery store (Tr. at 56).

Plaintiff did not work when he was in Texas (Tr. at 57). He worked as a part-time assembler at an auto products company before he went to his parents' grocery store (Tr. at 57). That job was in Kansas City, and he worked there after he got out of prison (Tr. at 58). Plaintiff was doing that work full time for $5 an hour, but when the recession hit he went down to two or three days a week (Tr. at 58). From July to December in 2005, plaintiff worked for Burnell Stewart putting parts together (Tr. at 59, 60). He had to get up, walk to pick up parts, take those to his bench, and sit down and assemble the product (Tr. at 60). He lifted about 10 to 15 pounds at that job (Tr. at 60-61). It was supposed to be full time but sometimes there was work, sometimes there wasn't (Tr. at 59). That company went out of business (Tr. at 60, 61). Plaintiff worked helping in construction framing, but it got to the point where he had to be carried off the job around lunch time because he could not walk due to back pain (Tr. at 59, 62). At the time he was using Flexeril and either Hydrocodone or Oxycodone (Tr. at 59). Then from 2007 until 2012 plaintiff worked at the family business (Tr. at 62). He worked in the produce department, dairy department, and meat department (Tr. at 62). He primarily worked in the meat department, but he would help sacking groceries when needed (Tr. at 62, 65). He worked 4 hours per day and earned $8 per hour (Tr. at 62-63). Plaintiff only worked part time because the WalMart Supercenter in town took a lot of the business from his family's

grocery store (Tr. at 63). Plaintiff never worked full time at the grocery store – at the most he worked about 28 hours a week (Tr. at 63-64). He alleges he became disabled in December 2010 while he was working at the store – that is when his parents sold the store (Tr. at 68). Plaintiff continued working there into 2012 (Tr. at 62). Then the owner of the store told him he may as well go sign up for unemployment because they were on the verge of losing the store (Tr. at 69).

Plaintiff gets $80 per week for unemployment, and his roommate pays the other bills (Tr. at 52). Plaintiff has been getting unemployment for about a year (Tr. at 52). When the ALJ asked plaintiff about the inconsistency of his applying for disability, alleging he can do no work, while he also collects unemployment, alleging he is able and willing to work, plaintiff said, "[E]very time I go put an application in and everything and they see my medication list, and it's just 'uh-oh.' You know, I'm willing to work and everything but I can only stand up for a little bit of the time there, you know, and then it just starts hurting so stinking bad, then I have to sit down and I can get up and go a little bit more." (Tr. at 53). Whenever plaintiff is out, he has whoever is driving him stop some place so he can fill out an application (Tr. at 54). He puts in about two applications per week (Tr. at 54).

Plaintiff stopped working when the grocery store closed, but he could not have continued working there even had it stayed open (Tr. at 69). He kept blacking out without warning (Tr. at 69). He would not even get dizzy, he would just fall (Tr. at 69). About two months before the hearing, he was washing dishes and just fell onto the tile floor, breaking open his elbow, his thumb, and his head (Tr. at 69-70). Plaintiff does not know how long he lay on the floor, but his roommate found him (Tr. at 70). His doctor adjusted his blood pressure

34

medication about two weeks before the hearing and that seems to have helped (Tr. at 70).

Plaintiff has Medicaid insurance through MO HealthNet (Tr. at 53). He has had this insurance since June 2011 (Tr. at 53). He cannot stand for very long because pain starts running down his left leg from his groin (Tr. at 66). He can hardly walk on it (Tr. at 66). X-rays showed a bunch of vertebrae in his back are crushed – he used to be 6' 2" tall and now he is only 5' 9" tall (Tr. at 66). When plaintiff was working at the grocery store, he carried around 10-pound bags of ice and dropped ice down the back of his shirt to keep cool (Tr. at 66-67).

Plaintiff had steroid shots recently (Tr. at 72). Then his doctors said they could not do anything more for him and recommended he see a surgeon (Tr. at 72). He did, but then he had to have a colonoscopy to find out the source of the blood in his stool (Tr. at 73). A couple days later he had surgery on his elbow to scrape out an infection and the surgeon put staples in his elbow (Tr. at 73-74). Plaintiff continues to smoke about a pack of cigarettes per day (Tr. at 74). His surgeon has told him that in order to have a successful back surgery, he needs to stop smoking (Tr. at 74). His surgeon told him he has a 50/50 chance of seeing improvement with his walking after surgery (Tr. at 75). Even though he knows he needs to stop smoking in order to have surgery and allow his bones to heal, he has not stopped but has been working on it (Tr. at 75).

Plaintiff is right handed (Tr. at 75). He can stand for 30 to 35 minutes before needing to sit down (Tr. at 75-76). Plaintiff can sit comfortably for 30 to 60 minutes at a time (Tr. at 76-77). He can lift 25 to 30 pounds (Tr. at 78). Plaintiff does not know how to operate a computer (Tr. at 54–55).

Plaintiff applied for disability in March 2011, and that was denied in August 2011 (Tr.

at 70). He does not know why he didn't appeal that denial (Tr. at 70-71). This time when plaintiff got denied, his sister filled out the paperwork for him (Tr. at 71-72).

## 2. Vocational expert testimony.

Vocational expert Denise Waddell testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could lift 20 pounds occasionally and 10 pounds frequently; stand and walk for six hours per day but could walk for no more than two hours at a time; sit for six hours per day; could never climb ropes, ladders, or scaffolds; and should avoid exposure to work hazards such as unprotected heights and being around dangerous moving machinery (Tr. at 82). Such a person could perform plaintiff's past relevant work as an assembler, DOT 706.687-010, light exertion, unskilled with an SVP of 2 (Tr. at 80, 82). The person could also do other light work, such as electrical assembler, DOT 729.684-054, with 1,200 jobs in Missouri and 55,000 in the country; a collator operator, DOT 208.685-010, with 1,100 in Missouri and 29,000 in the country; or a price marker, DOT 209.587-034, with 2,050 in Missouri and 92,400 in the country (Tr. at 82-83).

The second hypothetical was the same as the first except the person could not walk more than one hour at a time (Tr. at 83-84). Such a person could still do plaintiff's past relevant work as an assembler, which he performed basically in a seated position, but normally the job requires standing all day with very little walking (Tr. at 84). Even if the person could not walk more than 30 minutes at a time, the assembler job could still be performed (Tr. at 84).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge Carol Boorady entered her opinion on April 18, 2014 (Tr. at 19-31). Plaintiff's last insured date is December 31, 2016 (Tr. at 21).

36

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 21).  He worked after his alleged onset date but his earnings were lower than that considered evidence of substantial gainful activity (Tr. at 21).

Step two.  Plaintiff has the following severe impairments:  degenerative disc disease of the lumbar spine and history of non-ST elevation myocardial infarction with multi-vessel bypass surgery (Tr. at 21).  Plaintiff's chronic pain syndrome is non-severe because it was noted to be controlled with medication and did not cause any more than a minimal vocationally relevant limitation independent of those caused principally by plaintiff's degenerative disc disease of his lumbar spine (Tr. at 22).  Residual symptoms from a right clavicle fracture are non-severe because x-rays showed no acute abnormalities and no more than minimal vocationally relevant limitations (Tr. at 22).  Plaintiff's chronic bursitis is non-severe since it did not cause more than a minimal vocationally relevant limitation for a period of 12 months or longer (Tr. at 22).  Plaintiff's hyperlipidemia, hypercholestrolemia and hypertension are non-severe since they do not cause more than a minimal vocationally relevant limitation (Tr. at 22-23).  Plaintiff's anxiety is non-severe as it does not cause more than a minimal limitation and his treatment history has been sporadic (Tr. at 23).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 24).

Step four.  Plaintiff retains the residual functional capacity to lift up to 20 pounds occasionally and 10 pounds frequently; stand or walk for six hours per day and for up to 30 minutes at a time; sit for six hours per day;[23] cannot climb ropes, ladders, or scaffolds; and

---

[23]By way of comparison, plaintiff testified that he can stand for 30 to 35 minutes at a time, sit for 30 to 60 minutes at a time, and lift 25 to 30 pounds.

should avoid exposure to hazards such as unprotected heights and being around dangerous moving machinery (Tr. at 25). With this residual functional capacity plaintiff can return to his past relevant work as an assembler (Tr. at 30).

## VI. *OPINION OF ROCHELLE, VALE, D.O.*

On December 20, 2013, plaintiff's primary care physician wrote a letter to whom it may concern:

> Thomas is a patient in the Laurie Clinic. He is seen here on a very regular basis. Thomas has several diagnosis [sic] of which the main ones are chronic back pain, lumbar spinal stenosis, compression fracture of lumbar spine, scoliosis, degenerative disease of lumbar spine, and anxiety. Tom would not be able to seek gainful employment due to the back pain and disability. He would have issues sitting or standing for any length of time. He has pain and weakness of his lower extremities due to the severe back degeneration. He is not able to seek employment most likely for the extent of his life.

Plaintiff argues that the ALJ erred in failing to contact Dr. Vale to obtain clarification about her opinion.

Plaintiff's argument is without merit. An ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision. Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013). Once an ALJ concludes, based on sufficient evidence, that the treating doctor's opinion is "inherently contradictory or unreliable," the ALJ is not generally required to seek more information from that doctor. Samons v. Astrue, 497 F.3d 813, 819 (8th Cir. 2007) (citing Hacker v. Barnhart, 459 F.3d 934, 938 (8th Cir. 2006)). In addition, 20 C.F.R. §§ 404.1520b and 416.920b provide that if the record is inconsistent but still sufficient, the ALJ may reach a conclusion based on the evidence at hand, as was done here, and remand is not required. See

38

Brown v. Colvin, 2014 WL 1687430 (W. D. Mo., April 29, 2014); Ohmart v. Colvin, 2014 WL 1669266 (W.D. Mo., April 28, 2014).

Plaintiff points out the many visits plaintiff had with Dr. Vale (and the other doctors in her practice) and all of the diagnoses she made through her treatment of plaintiff. However, when one looks at the substance of those records as opposed to the number, little support emerges for her opinion in the December 20, 2013, letter.

- On February 15, 2013, plaintiff described his back pain as an 8 or 9 out of 10 and reported great limitation in motion. On exam, Dr. Vale observed no cyanosis, no edema, normal range of motion. The only abnormalities in the exam were slow antalgic gait and unspecified limited range of motion in the lumbar spine with tenderness and muscle spasm. Although plaintiff denied anxiety and Dr. Vale noted no anxiety, her primary diagnosis was anxiety.

- On May 23, 2013, plaintiff reported that overall he was doing pretty well. His physical exam was the same as the previous exam on February 15, 2013. Although she found that plaintiff's chronic pain was stable and he said he was doing pretty well, she granted his request to increase his narcotic pain medication, almost doubling his dose.

- On July 2, 2013, plaintiff told Dr. Vale he was feeling fine. His physical exam was entirely normal. Dr. Vale's record indicates that plaintiff's many problems were likely caused by his excessive use of alcohol and his smoking.

- On July 9, 2013, Dr. Vale discussed lab work with plaintiff, and she told him that his anemia was caused by his alcohol abuse. She told him to stop drinking and stop smoking. Plaintiff said he "feels great and has no complaints".

- On August 8, 2013, Dr. Vale's physical exam of plaintiff was normal except for fluid collection on his elbow.

- On August 21, 2013, Dr. Vale's physical exam of plaintiff was normal except for fluid collection on his elbow.

- On August 23, 2013, Dr. Vale's physical exam of plaintiff was normal except for an infection on his elbow. Plaintiff had admitted he did not follow the aftercare instructions and had not kept his elbow clean.

- On August 26, 2013, plaintiff told Dr. Vale he had been sick because he spent a lot of time out in the sun despite having been told to avoid sun exposure due to his antibiotic

39

medication.  Dr. Vale's physical exam of plaintiff was entirely normal except his infected elbow.

☐ On September 5, 2013, plaintiff told Dr. Vale that his pain is "well controlled."  His physical exam was entirely normal except his elbow.  Dr. Vale gave plaintiff another prescription for Norco, then sent him to the emergency room for his infected elbow where he was given another prescription for Norco.

☐ On September 20, 2013, plaintiff told Dr. Vale that he was feeling well.  His physical exam was normal except for his infected elbow.

☐ On October 18, 2013, plaintiff told Dr. Vale he had only had one episode of pre-syncope, and he did not think it had anything to do with the eight cans of beer he had consumed.  Dr. Vale told plaintiff that his alleged recent memory problems were caused by his alcohol abuse.  His physical exam was normal that day except some decreased range of motion in his lumbar spine.

Those are the records of Dr. Vale's treatment of plaintiff prior to her December 20, 2013, letter finding him unable to seek employment for the rest of his life.  In that letter, the only functional restriction was that plaintiff would have "issues [with] sitting or standing for any length of time."

Dr. Vale's records show that she primarily wrote prescriptions for plaintiff (even increasing his narcotic pain medication per his request during a visit when he said he was feeling fine and she assessed his chronic pain as stable), and counseled him on his abuse of alcohol and his continued smoking.  There is no mention in any of her records of plaintiff complaining that sitting, standing or walking worsened his pain; there is no recommendation by Dr. Vale that plaintiff attempt to limit his sitting, standing or walking to improve his pain.  The only time sitting, standing or walking were mentioned in any of Dr. Vale's records was to describe plaintiff's dizziness when changing positions, and Dr. Vale attributed that to plaintiff's alcohol intake.

When assessing the opinion of Dr. Vale in her December 20, 2013, letter, the ALJ stated as follows:

> On the one hand, as a treating physician, Dr. Vale is qualified to render a statement as to the claimant's ability to function. Moreover, her conclusion that the claimant may experience some limitations with respect to standing and/or walking is partially consistent with the objective medical evidence of record, as discussed above. On the other hand, statements that the claimant is disabled are not medical opinions. Rather, they are administrative findings dispositive of a case. Such findings are reserved to the Commissioner of the Social Security Administration. Statements on issues reserved to the Commissioner are not entitled to any special significance. The fact that Dr. Vale focused her statement on the claimant's ultimate ability to work, as opposed to his functional abilities, significantly limits the persuasive value of her statement. Moreover, her statement is facially inconsistent with the medical evidence of record, which does not establish the degree of limitation opined by Dr. Vale. Thus, taken together, Dr. Vale's statement is afforded partial weight.

(Tr. at 29).

The only abnormality in any of Dr. Vale's records was a finding of diminished range of motion in plaintiff's lumbar spine; however, she never made any findings with regard to the extent of that limitation. Pauline Abbott, D.O., had previously noted that plaintiff's flexion-extension of the lumbar spine (bending forward at the waist) was 70° (normal is 90°), and all other range of motion measurements of the lumbar spine were normal. This is not inconsistent with Dr. Vale's records. Thomas Reinsel, M.D., at the Missouri Spine Center observed that plaintiff's gait was normal (this was a month before Dr. Vale's letter), his lumbar spine extension was "fairly good" and he was able to reach his mid-distal calf with his fingertips. Dr. Reinsel's physical exam of plaintiff was normal. X-rays from that day showed disc heights relatively well maintained. Pelvis x-rays were normal and showed no significant arthritis in his hips. Dr. Reinsel did note compression fractures of L3 and L4 with fairly severe central stenosis at L2-3 and mild stenosis at L3-4, unchanged in the past year; and the year before

41

plaintiff had completed a Function Report indicating that he is able to ride a bike. Furthermore, the month after Dr. Vale wrote her opinion letter, plaintiff saw Dr. Reinsel at the Spine Center and described his pain as "a dull ache." He also indicated that once he gets up and walks around, his pain is improved. His physical exam was essentially normal. Also that month, Dr. Vale saw plaintiff again and, despite finding him disabled for life a month earlier, noted that his physical exam was normal on this visit. The following month Dr. Reinsel's exam of plaintiff was normal, and a month after that Dr. Vale's exam of plaintiff was normal.

Dr. Vale (and her nurse practitioner) consistently recommended that plaintiff stop smoking, stop drinking alcohol, start drinking water, and take his medications as directed. However, Dr. Vale never recommended that plaintiff limit his sitting, standing, or walking in order to alleviate his symptoms. She never placed any functional restrictions on plaintiff whatsoever, and she never noted that he complained of any exacerbation in his pain from sitting, standing, or walking.

Based on the substantial evidence in the record, I find that the ALJ did not err in failing to contact Dr. Vale for clarification of her opinion in her letter to whom it may concern. I further find that the ALJ did not err in failing to give controlling weight to the opinion of Dr. Vale.

## VII.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff argues that the ALJ erred in finding that plaintiff is capable of standing and/or walking for six hours per workday, and in connection with this argument, plaintiff takes issue with the ALJ's finding that plaintiff's testimony is not entirely credible.

42

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to

43

relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant participated in a significant variety of daily activities during the relevant period. For example, the claimant took walks in the morning. He prepared meals on a daily basis. He did light cleaning including sweeping and vacuuming. He mowed grass. He rode a bicycle. He shopped for groceries in stores. He went fishing and attended church on a regular basis. This range of daily activities tends to be inconsistent with the claimant's allegations of disability. This, in turn, detracts from the credibility of the claimant's allegations, regarding the severity of his alleged impairments.

> As to other credibility factors, the claimant's pattern of treatment was generally conservative. The claimant's back was not a candidate for surgical correction because the claimant would not stop smoking, which supports reasonable inferences that the claimant's condition was not as significant as he alleges and he was unwilling to make lifestyle changes to possibly resolve his allegedly disabling back symptoms. Moreover, the claimant's treatment subsequent to his myocardial infarction tended to be conservative. Generally, his heart condition was controlled with medication, subsequent to the surgical intervention. Thus, the claimant has not received the type and frequency of treatment that one would expect for a totally disabled individual. This also decreases the credibility of the claimant's allegations.

> Moreover, there is evidence that the claimant stopped working for reasons not related to the allegedly disabling impairments. Additionally, a review of the claimant's work history shows that the claimant worked only sporadically prior to the alleged disability onset date, which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments. Thus, the claimant's work history also takes away from the credibility of the claimant's allegations.

> The claimant testified that, at the time of the administrative hearing, he was receiving $80.00 per week in unemployment compensation. By applying for and receiving unemployment benefits, the claimant represented to the state of Missouri that he was ready, willing, and able to work. This representation is wholly inconsistent with the claimant's representation to the Social Security Administration that he became completely unable to work on December 31, 2010. These inconsistent statements reflect poorly on the claimant's credibility as a witness herein. Each of these factors further decreases the credibility of the claimant's allegations, regarding the severity of his allegedly disabling impairments.

44

(Tr. at 28).

In addition to the factors discussed by the ALJ, I note that on February 15, 2013, during plaintiff's first visit with Dr. Vale, he told her that his back pain was normally an 8 or 9 out of 10 in severity and that he had "great limitation" in motion. However, Dr. Vale prescribed Norco in a smaller dose than plaintiff had been getting from his previous doctor. On January 2, 2014, plaintiff told Dr. Reinsel that his back pain was a 9 out of 10 in severity despite continuing to take a narcotic pain medication every day along with other medications. At that visit, Dr. Reinsel observed that plaintiff was a pleasant gentleman in no acute distress, which certainly does not mirror plaintiff's description of the severity of his symptoms. On February 18, 2014, plaintiff told Dr. Reinsel that his pain was a 9/10 in severity; however, Dr. Reinsel again observed that plaintiff appeared pleasant and in no acute distress with normal gait, a normal physical exam, and only some tenderness in his lumbar spine with no muscle spasm.

The medical records also establish that plaintiff had several episodes of fainting and pre-syncope, which were suspected to have been caused by his alcohol abuse; he had anemia which was caused by his alcohol abuse; his alleged memory problems were noted to be caused by his alcohol abuse; his low blood sodium was caused by his alcohol abuse; and his cold and numb hands were noted to be caused by his smoking.

The medical records show that plaintiff did not always take his hypertension medication as directed, he took more pain pills than prescribed in order to sleep better, and he continued to abuse alcohol despite being on multiple medications which are not to be taken with alcohol. On January 23, 2014, he told Dr. Vale's nurse that he had not smoked in two days, but when his

45

blood pressure wound up being high that day, he admitted to Dr. Vale that he had already smoked a half a pack of cigarettes that day before his appointment with her.

Based on the substantial evidence in the record, I find that the ALJ's decision to discredit plaintiff's subjective complaints of disabling symptoms is supported by the record.

A residual functional capacity is the most an individual can do despite the combined effect of all of his credible limitations. 20 C.F.R. § 404.1545 and 416.945. It is the claimant's burden, and not the Commissioner's, to prove the claimant's residual functional capacity at step four of the sequential evaluation; and it is the ALJ's responsibility to determine the claimant's residual functional capacity based on all of the relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004); 20 C.F.R. §§ 404.1545 and 416.945. A residual functional capacity assessment need only include a claimant's credible limitations. Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006).

Plaintiff's argument essentially relies on the number of doctor visits and tests that appear in the record. This is not persuasive. A summary of those records and tests is set forth above and will not be repeated here. The fact that plaintiff regularly went to the doctor is not dispositive. The records show that he had some spinal impairment, but that his condition was noted to be stable and his treatment stayed the same for several years. He was treated with nothing more than medication (albeit a course of narcotic pain medication lasting years, and resulting in diagnoses of chronic narcotic use as well as problems with constipation followed by intestinal difficulties and surgery) and steroid injections. Any discussion of surgery was

46

preliminary, and plaintiff's refusal to stop smoking limited any treatment in that direction in any event. And as discussed by the ALJ, plaintiff's refusal to stop smoking indicates that his back pain was not bad enough for him to consider making lifestyle changes in order to improve his condition.

Based on the substantial evidence in the record, I find that the ALJ's residual functional capacity assessment is based on all of the credible evidence in the record. Plaintiff's remaining arguments concerning the residual functional capacity assessment have been considered and are rejected based on all of the above.

## VIII.   CONCLUSION

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 27, 2016

47